# REPORT TO THE COURT BY THE RECEIVER OF

# UNITY HOUSE, INC.

## EG&G Technical Services, Inc.
### Court-Appointed Receiver

BROOK HART, ESQ.
Law Offices of Brook Hart

FRED H. ALTSHULER, ESQ.
PEDER THOREEN, ESQ.
Altshuler, Berzon, Nussbaum,
Rubin & Demain

*Counsel for Unity House, Inc. In
Receivership*

October 21, 2005

EXHIBIT 1

## TABLE OF CONTENTS

**Section I**     **INTRODUCTION** .......................................................... 1

Summary of findings and recommendations

**Section II**     **COST SAVINGS ACTIONS** ....................................... 9

Describes cost saving efforts in staffing, programs
and other operational areas

**Section III**     **MANAGEMENT OF ASSETS** ..................................... 14

Describes the efforts taken to preserve assets and
re-organize investments

**Section IV**     **PROGRAMS** ............................................................ 20

Describes current Unity House programs and activities
for beneficiaries

**Section V**     **LITIGATION** ............................................................. 29

Describes efforts to settle, prosecute or defend ongoing
civil litigation

**Section VI**     **COLLECTION OF RECEIVABLES**............................. 36

Describes efforts to collect outstanding receivables

**Section VII**     **TAX-EXEMPT STATUS** ............................................ 38

Describes issues relating to the tax-exempt
status of the organization

**Section VIII**     **CONCLUSION** ......................................................... 43

# TABLE OF EXHIBITS

**EXHIBIT A**   Unity House Board of Directors December, 2004............................ i

**EXHIBIT B**   Unity House, Inc. Budget Calendar Year 2005................................ ii

**EXHIBIT C**   2005 REVENUE FORECAST Unity House, Inc............................ iii

**EXHIBIT D**   UNITY HOUSE, INC.................................................................... iv
Actual Performance vs. Budget

**EXHIBIT E**   Unity House Portfolio Investment.................................................. v
Value Update @ 8/31/05

**EXHIBIT F**   UNITY HOUSE PROGRAMS & EVENTS ACTIVITY SUMMARY
DECEMBER 14, 2004 - SEPTEMBER 1, 2005............................ vi

## I. INTRODUCTION

Unity House, Inc. ("Unity House") is a non-profit corporation established in 1951 and maintained to provide services and benefits to the working people of Hawaii.    Among its founding purposes is to bring together in a fraternal organization members of various labor unions.  For over 50 years, Unity House has provided benefits to these individuals, ranging from childcare subsidies to programs for senior citizens and scholarship aid to deserving students.

For most of its history, many Unity House beneficiaries (currently numbering approximately 20,000) were "members" of the corporation with voting rights under the Hawaii Nonprofit Corporation Act.  However, in 2003, Unity House management and Board of Directors eliminated Unity House's membership in its entirety.  Unity House management accomplished this by soliciting proxies from members, and, in late 2003, voting these proxies to support the elimination of membership.  In an indictment issued on December 2, 2004, a grand jury in the criminal proceedings now before this Court, *United States v. Rutledge, et al.*, CR No. 02-438 DAE, charged that disseminating false or misleading information in the context of soliciting proxy votes in furtherance of these actions constituted mail fraud.  The grand jury further found that these allegedly illegal activities by management rendered certain enumerated assets – including the assets of Unity House – subject to forfeiture upon an eventual conviction.

By a restraining order issued by Senior District Judge Samuel P. King on

December 10, 2004 (the "Restraining Order"), the United States government was permitted to seize certain assets potentially subject to criminal forfeiture and to take custody of Unity House.[1]  To this end, and consistent with the terms of the Restraining Order, the Internal Revenue Service and its agent, EG&G Technical Services, Inc. (the "Receiver"), were appointed custodian of Unity House and are now overseeing Unity House's operations.[2]  The Restraining Order granted the Receiver the power to, among other things, take all reasonable business decisions on behalf of Unity House, immediately collect unpaid receivables, and repatriate Unity House assets.  Consistent with these powers, the Receiver has preserved and protected the assets of Unity House, maintained programs and provided services for Unity House beneficiaries, and taken aggressive steps to stabilize Unity House's deteriorating financial condition by collecting debts, reducing Unity House's participation in high-risk investments, resolving pending litigation, and otherwise repatriating Unity House assets.  This Report is intended to update the Court on the Receiver's activities to date and to call the Court's attention to serious issues that have been noted concerning Unity House's

---

[1] Judge King's restraining order was followed and supplemented by an injunction issued by Chief Judge David Alan Ezra on January 19, 2005.

[2] The Restraining Order provides that "the Internal Revenue Service, and/or EG & G Technical Services, Inc. [IRS's contracted Asset Manager], and their authorized agents and representatives, shall seize and take custody of the identified properties and monetary interests and maintain them in their custody and control until further order of this Court." Restraining Order at 7. Because the Court, parties to this litigation, and third parties have consistently referred to EG&G Technical Services and its agent, Anthony Pounders, as the "receiver" of Unity House, the Receiver employs that term in this Report.

At the time the receivership began, Anthony Rutledge, Sr. was Chief Executive Officer of Unity House, and Randall Harakal was its Senior Vice President, Executive Director, and General Counsel. *See* Exhibit A for a complete list of directors as of December, 2004.

2

continued operations.

Upon taking custody of Unity House, the Receiver discovered that the organization's net worth had precipitously declined in recent years. Based on financial statements and third party opinions provided in this Report, it appears that Unity House, prior to the Restraining Order, was approximately two to four years from insolvency. As detailed further in Section II of this Report, Unity House experienced substantial net losses in each of the three calendar years prior to the Restraining Order. The amount of these losses totaled $9.3 million in 2002, $5.4 million in 2003, and $4.7 million in 2004. When the Receiver was appointed in December 2004, Unity House's net worth had dwindled to $29 million from $48.7 million just 4 years earlier.[3] Unity House suffered these extraordinary losses despite clear warnings from investment advisors at the Bank of Hawaii and Smith Barney, which alerted Unity House to its asset management problems.[4] For reasons that remain unclear, Unity House management and Board of Directors took little or no action to restrain spending in response to these warnings and continued a pattern of speculative and unwise investing.

One immediate cause for the erosion of Unity House's resources, overspending, has been controlled by the Receiver's cost saving actions as discussed in Section II of this report. For example, by eliminating unnecessary

---

[3] The dramatic decline in Unity House's net worth is detailed in Section II, *infra*.

[4] An August 6, 2003, analysis of Unity House management and investment practices by Bank of Hawaii was attached to the government's January 5, 2005, Motion for a Preliminary Injunction. Among other things, this analysis found "questionable management capacity, especially in investment decisions." The analysis also determined that "the organization is unable to control spending, draining cash and liquid assets." On the basis of these observations, Bank of Hawaii

positions, the Receiver has reduced monthly payroll costs by over 50%, even with the addition of recently-hired Interim Executive Director Dwight Kealoha, formerly part of the custodial team for the Bishop Estate. The Receiver has also dramatically reduced legal costs, which had been $1.3 million in the year prior to the Restraining Order. As a result of these and other cost-cutting measures, Unity House's net losses for the eight months ending August 31, 2005, were $800,000, down from $4.7 million in 2004.

Much of Unity House's declining financial condition was due to the willingness of the Unity House Board of Directors to approve risky or otherwise imprudent investments or loans. For example, due to worthless collateral Unity House had been unable to collect on a $225,000 loan, had lost over $3 million in a speculative start-up business investment, and had a purported business partner abscond with $250,000 in Unity House funds. These problems were compounded by numerous poorly-drafted agreements that contained ambiguous language or left unarticulated critical terms, such as repayment deadlines for loans and methods of calculating returns on investments. There emerged a pattern of unattended debts and imprecise resolution of several business transactions. In addition, it appears that certain loans and investments benefited friends and employees of Unity House management, with repayment deadlines left unclear or unexpressed. Unity House failed to pursue aggressively the collection of certain of these receivables.

The Receiver has taken steps to reduce the organization's exposure and

---

concluded that Unity House had "2.72 years of remaining life."

to collect on outstanding receivables. The Receiver has repatriated well over $300,000 by pursuing uncollected loans, withdrawing Unity House participation in a highly speculative investment, and obtaining a settlement with an insurance company. The Receiver has ensured the security of over $6,000,000 in Unity House funds by withdrawing them from a highly volatile investment associated with an individual who was recently convicted of over 20 felony counts for his activities relating to another business venture. This individual has been sentenced to federal prison. These and other actions taken by the Receiver over the past ten months are projected to save Unity House $2.96 million by the end of 2005.

Civil litigation of various types, pending or threatened, has required the Receiver to expend substantial Unity House funds. Many of these expenditures were used in successful efforts to repatriate assets and collect outstanding receivables. Additionally, Unity House has been the target of two civil complaints filed since the inception of the receivership. Finally, Unity House has had to prosecute or defend litigation that pre-dated the Restraining Order, most of which arose from various failed or infirm investments, loans, and business transactions.

Meanwhile, the Receiver has maintained nearly all of the programs for Unity House beneficiaries. Since the Receiver's appointment, Unity House has awarded hundreds of scholarships (grants in aid) to help students pay for college. Unity House has continued its Early Education Scholarship subsidy and increased the per-month award to help Unity House beneficiaries meet the rising costs of childcare. The Receiver has maintained regular programs for senior

citizens, and, during the course of the receivership, Unity House has hosted special events for hundreds of seniors. Additionally, since the receivership began, Unity House put on its annual Keiki Zoolites event at the Honolulu Zoo, hosted a golf tournament, organized two bowling tournaments, and donated thousands of packets of school supplies to children in anticipation of the current school year. Unity House is planning a 2005 Thanksgiving luncheon for seniors that will serve over 1,500 individuals. And, although certain reductions in programs were required for financial reasons, these reductions were limited almost exclusively to social or athletic programs, with no reductions to programs addressing critical needs of Unity House beneficiaries.

In sum, the Receiver has made significant strides towards restoring Unity House's financial stability in the past ten months, while maintaining its commitment to providing services to its beneficiaries. However, in evaluating Unity House's future operations after the termination of the receivership, the Receiver notes several potentially serious problems that could threaten Unity House's continued viability.

First, a major factor contributing to Unity House's severe financial decline was the failure of its Board of Directors to exercise meaningful oversight in reviewing Chairman Anthony Rutledge, Sr.'s proposed expenditures. The Board routinely approved his proposals for risky and speculative investments, often in the face of clear warnings by Unity House's professional advisors. Board minutes show that it rarely questioned Anthony Rutledge, Sr.'s management decisions, and it never implemented the types of audits and controls that would

6

be appropriate for a non-profit corporation of Unity House's size and mission. As a result, Unity House's financial operations were replete with poorly-drafted contracts, failure to pursue the collection of outstanding receivables and other examples of mismanagement.

The proposed plea agreements now pending before this Court provide for reinstatement of all former Unity House directors except Anthony and Aaron Rutledge.[5] In addition, although the plea agreement removes Anthony Rutledge, Sr. from Unity House management and provides that he will not indirectly control the Board's operations, it explicitly allows him to be employed as a Unity House "consultant." Under his plea agreement, Aaron Rutledge would be required to resign from Unity House for a one-year period, but he would be permitted to act as a consultant to Unity House during that period. After one year, Aaron Rutledge would be permitted to return to Unity House in an official capacity as an officer or director or both. The Receiver believes that an independent and competent Board of Directors, comprised of members with familiarity with labor organizations and appropriate training and expertise in non-profit policy and investment management, are vital if Unity House's financial viability is to be restored.

Second, before the indictment, Anthony Rutledge, Sr., entered into an indemnity agreement with the Unity House Board that obligates Unity House to pay all of his attorneys fees, including his fees defending the criminal charges

---

[5] The plea agreement also effectively allows Anthony Rutledge, Sr., to select the list of candidates to replace him and Aaron Rutledge on the Unity House Board.

that may result in his conviction. If he were convicted of a criminal offense in these proceedings, it is unclear whether Unity House could legally pay those fees. *See* Haw. Rev. Stats. §§ 414D-160(a)(3) (indemnification permissible for criminal conduct if indemnitee had no reasonable cause to believe conduct was unlawful), (d)(2) (indemnification impermissible where director found liable on the basis of improper receipt of a personal benefit). The proposed plea agreement permits the Unity House Board to pay this indemnity, notwithstanding the guilty plea. The Receiver has been informed that Anthony Rutledge, Sr.'s attorneys fees alone now exceed $1,000,000. In addition, the plea agreement permits Unity House to pay whatever separation and severance pay and other benefits the Board may deem appropriate. In light of Unity House's precarious financial condition, the added obligation of paying Anthony Rutledge, Sr.'s attorneys fees and separation pay could be ruinous. In addition, as discussed below, such a payment could raise serious issues regarding Unity House's current tax status and future tax liability. *See* Section VII.

Third, of significant concern to the Receiver is Unity House's status as a tax-exempt organization. Not only have the actions or inaction of Unity House management caused the organization to suffer extraordinary financial losses, but the types of activities that have been undertaken and the way in which Unity House funds have been spent may have compromised Unity House's status as a tax-exempt entity under Section 501(c)(5) of the Internal Revenue Code. The Receiver has retained independent CPA and tax counsel to examine Unity House's tax status and has invited the Internal Revenue Service to conduct an

8

audit in hopes of remedying any compliance issues and securing Unity House's tax-exempt status going forward. A case agent from the Internal Revenue Service has recently contacted the Receiver in response to the Receiver's invitation.

Finally, the Receiver has concerns regarding the plea agreements' failure to address potential legal action against the Receiver and its agents for business judgments or other decisions made or taken during the course of the receivership. As the Court is likely aware, receivers ordinarily enjoy qualified immunity from personal liability for actions taken within their receivership authority. *See, e.g., Morrison-Knudson Co. v. CHG Int'l, Inc.,* 811 F.2d 1209, 1222 (9th Cir. 1987). However, counsel for suspended board members have intimated that they may nevertheless make claims against the Receiver and/or its counsel for actions taken within the scope of the receivership. In light of these threats, the Receiver asks that this Court retain jurisdiction beyond the resolution of the plea agreement to address any matter concerning the administration of the receivership.

## II.  COST SAVINGS

At the time the Receiver was appointed, on December 10, 2004, Unity House had suffered three years of staggering financial losses – some $20 million since FY2001. The nature and extent of these losses is reflected in the following spreadsheet:

| Unity House, Inc. | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 3 Year History and Current YTD | | | | | | | |
| | 12/31/2004 | | 12/31/2003 | | 12/31/2002 | | 12/31/2001 |
| Beginning Asset Values | 29,167,919 | | 33,937,911 | | 39,357,855 | | 48,713,062 |
| | | | | | | | |
| | 8 Months | | 12 Months | | 12 Months | | 12 Months |
| | ended | | ended | | ended | | ended |
| | 8/31/2005 | | 12/31/2004 | | 12/31/2003 | | 12/31/2002 |
| Revenues: | | | | | | | |
| | | | | | | | |
| Gains (losses) from investments | (121,694) | | 555,348 | | 956,033 | | (5,116,929) |
| Rental and other income | 1,143,407 | | 249,140 | | 248,072 | | 656,104 |
| | | | | | | | |
| Total Revenues | 1,021,713 | | 804,488 | | 1,204,105 | | (4,460,825) |
| | | | | | | | |
| Costs and Expenses: | | | | | | | |
| Salaries, wage and benefits expense | 648,463 | | 2,150,451 | | 2,425,340 | | 2,380,059 |
| Cost of programs and operations | 1,170,092 | | 3,424,029 | | 3,066,311 | | 2,514,323 |
| Settlement cost to C&C and IGLLC | | | 0 | | 1,132,398 | | 0 |
| | | | | | | | |
| Total Cost and Expenses | 1,818,555 | | 5,574,480 | | 6,624,049 | | 4,894,382 |
| | | | | | | | |
| Excess of Costs and Expenses over Revenues | (796,842) | | (4,769,992) | | (5,419,944) | | (9,355,207) |

Although prior Unity House management made some staffing cuts in 2004, these efforts were ineffective in addressing the organization's dire financial situation. Because the projected cost of operations would far exceed projected revenues, the Receiver has taken significant steps to further control costs. To this end, the Receiver developed a budget (Exhibit B) and revenue forecast (Exhibit C) to bring spending under control while preserving as many of the programs as possible. Items addressed by the budget were: staffing, consultants, special projects, investments, and the reduction or elimination of some non-essential programs. Actual performance as measured against the Receiver's budget may be found at Exhibit D.

10

A.    Staffing

Upon taking custody of Unity House on December 14, 2004, the Receiver retained only the minimum number of staff required to maintain the critical areas of operation; the rest of the staff were sent home during this process, but were fully paid.    Additional staffers were required to maintain some of the programs and were asked to return to work a few days later, but it quickly became apparent that the previous level of staffing was excessive for the workload.  In January 2005, sixteen employees were laid off with full severance pay and benefits.  In September 2005, retired Air Force Brigadier General Dwight Kealoha, formerly the interim Chief Administrative Officer for Bishop Estate/Kamehameha Schools while under court supervision, was hired as Interim Executive Director to handle the day-to-day administrative duties and assist in strategic and budget planning for 2006.

To date, the staff of Unity House has been reduced from 27 personnel in 2004, at a total cost in payroll and benefits of $2,150,451, to ten permanent personnel, with temporary support as needed, at a projected cost of payroll and benefits of $919,900 in 2005.  The 2005 costs include approximately one month's salary and full severance benefits for all laid off employees; therefore, costs will be significantly less in 2006 if current staffing levels are maintained.   Criminal defendants Anthony Rutledge, Sr.'s and Aaron Rutledge's severance payouts were withheld pending further investigation and resolution of the ongoing criminal proceedings.

Savings for staff are projected to total $1.2 million in FY2005.  It has been

11

possible to eliminate these excess salaries without a negative impact on Unity House programs.

### B.    Consultant Fees

Paid consultants were reduced from six to two, with a resulting savings of $20,000 per month. These reductions targeted individuals whose services were redundant, unnecessary, or, in fact, non-existent. The Receiver has maintained consulting agreements with a financial advisor and a public relations/marketing expert. Additional consultants are contracted on an as-needed basis

### C.    Legal Costs

Legal costs for Unity House prior to the receivership far outstripped expenditures on benefits or financial gains made by the organization. Unity House expended $1.3 million on legal fees in 2004 alone. This figure does not include unpaid invoices pending for Anthony Rutledge, Sr.'s criminal defense lawyers as of December 14, 2004. Unity House expended $500,000 on legal fees in 2003. Some of these costs are due to the ongoing civil matters discussed in Section V; the balance, however – nearly $700,000 in 2004 – is attributable to fees incurred in the criminal defense of Anthony Rutledge, Sr. and Aaron Rutledge. Whether these particular costs are allowable expenses or permissible compensation under the Internal Revenue Code are legitimate issues and payment of them may further endanger Unity House's tax-exempt status.

Since the commencement of the receivership, legal costs have exceeded the Receiver's early estimates, but they should fall well short of previous years' totals. Many of the expenditures have been necessary to prosecute or defend

litigation initiated prior to the receivership. The 2005 legal costs are offset by the collection of receivables, settlement of pending litigation, and other legal actions resulting in payment to the corporation. The avoidance of expensive litigation in the future, much of which has been caused by high risk, incompletely drafted, or inadequately documented investments and business transactions, will go far to stabilize Unity House's financial condition and provide more funds for programs for beneficiaries. See Exhibit D for details of 2005 costs to date and comparisons to 2004.

D.    Special Projects

The Receiver has discontinued a Unity House special project known as "Hawaii Pacific Cinema." This project was apparently intended to support movie productions promoting Hawaii. Anthony Rutledge, Sr. is President of Hawaii Pacific Cinema. It is unknown what benefit Unity House management expected from this endeavor, which it fully funded over three years at a total cost of $1,039,704. All funding was withdrawn in January, 2005, for a projected cost savings in 2005 of $240,000.

E.    High-Risk Investments

This item is addressed in Section III, MANAGEMENT OF ASSETS.

F.    Program Reductions

Some non-essential social or sports programs have been eliminated as described in Section IV. Additional cuts may be required to fully balance the budget and secure the future financial viability of the organization or to ensure that Unity House maintains its tax-exempt status.

G.    Conclusions re Cost Savings

Revenues generated by the Receiver for Unity House through August 31, 2005 ($1,021,713) have already substantially exceeded all of the revenue generated in FY2004 ($804,488). Nevertheless, the malaise of the stock market has impacted negatively on projected revenue to date. The Receiver hopes to reach favorable resolutions in certain pending civil actions in the near future, which will provide additional, significant contributions to earnings.

The Receiver projects that, through December 31, 2005, it will have reduced Unity House spending by approximately $2.96 million. If the receivership continues beyond that date, the Receiver expects to implement further cost saving measures which, when combined with reallocation of assets to income generating investments, should result in a fully balanced budget in 2006.

## III.  MANAGEMENT OF ASSETS

The Receiver's first step in the process of stabilizing the decline of Unity House finances was to examine the portfolio of stocks, real estate assets, and other investments. It was important to analyze the allocation of both past and ongoing investments. A pattern soon emerged, revealing that many of those assets were poorly allocated. Former Unity House management had made an abundance of high-risk investments, often pursued against the advice of retained investment advisors and uncritically approved by the Board of Directors. One investment manager, when interviewed, spoke of Unity House management attempting to hit "home runs" with their investment decisions. Several of these

14

"assets" actually cost Unity House much needed revenues. The Receiver developed a strategy to eliminate speculative investments, maximize performing assets and reallocate resources as necessary to stabilize the financial condition of the corporation.

A.    Staffing

Although this item is addressed fully in Section II, *supra*, employees may be considered on an asset value basis as well. Unity House had 27 employees at a cost of $2,150,451 in 2004, while Unity House investments generated only $804,488 during that year. Although some of the released staff had value, in Unity House's desperate financial situation reductions in staff have resulted in $1.2 million in savings, far outweighing the costs of the reduction in human capital.

B.    Stocks

Upon taking custody of Unity House, the Receiver discovered that Unity House was carrying an alarming margin debt of $8,000,000 against a portfolio value of approximately $14,000,000. In reviewing Unity House Investment Committee minutes, it was found that the Unity House financial advisor, Smith Barney, had recommended on several occasions in 2003-2004, that Unity House reduce or eliminate this debt, as any future significant downward move in the market could result in a margin call, causing Unity House to settle while in a negative position. Because of the recent increase in the prime interest rate and the stagnant stock market, the Receiver has concluded that it is unwise to attempt to balance Unity House's debt against portfolio performance. The

Receiver has reduced the margin debt to $2,000,000 through a combination of liquidation and re-investment of stock and real estate proceeds. Unity House's current portfolio and portfolio as of December 31, 2004, are summarized in Exhibit E. The Receiver may be able to eliminate this debt entirely, if assets become available from pending real estate sales and a pending foreclosure sale resulting from successful civil litigation (see Section V).

One of Unity House's stock funds, Granite Investment Advisors, a small cap growth fund, dominated the Unity House portfolio. Its $6,000,000 value represented nearly 50% of Unity House's portfolio assets; per Smith Barney guidelines, the maximum recommended asset allocation for a volatile fund in an aggressive portfolio is only 10–20% of an entity's assets. Additionally, Granite Investment Advisors was controlled by Dean Kirkland, who was convicted in federal court in 2004 of paying illegal gratuities to union pension fund trustees, wire fraud and obstruction of justice while managing Capital Consultants, Inc. On the written advice of fund advisor Smith Barney, the Receiver fully liquidated this fund. The proceeds were partially re-invested in historically more productive funds and partially used to pay down the large margin debt. See Exhibit E.

C.    Analysis of Several Previous Investments

1.    Ceatech USA, Inc.

In 1998, Unity House began investing in a start-up company, Ceatech USA, Inc., a shrimp farming operation. Anthony Rutledge, Sr. was on Ceatech's board of directors. From Unity House records, this project appears to have encountered one obstacle and disaster after another, including shrimp disease,

16

supply problems and quality control problems, yet Unity House continued to commit additional financial resources to the endeavor. An initial $1 million investment grew to over $3 million by 2003, with no sign that the venture was closer to success. Soon after the receivership began, Unity House received a request for additional investment funds; the request was refused. Ceatech USA, Inc., declared bankruptcy in May, 2005. Unity House wrote off this loss on its 2003 tax return.

## 2.    Lokahi Trovare

Lokahi Trovare began as a speculative investment/loan of $3,000,000 in a housing development project at Ewa Beach in 1995, with a loan agreement promising a return of $1,500,000. This investment devolved into expensive litigation. While the initial failure of the project appears to have been caused more by market forces than by negligence, Unity House decided to pursue litigation against the developer in 2001. The resulting litigation had cost $1,143,000 as of the date the Receiver was appointed. Moreover, in 2003, Unity House lost a jury trial, and the developer, Stanford Carr, obtained a judgment against Unity House for nearly $900,000 for his attorneys fees and costs. Unity House has since posted a $1.2 million bond while it appeals the trial court's decision. At this time, the Receiver must anticipate that this investment and the resulting litigation will continue as a significant loss for Unity House.

## 3.    Luckey Ranch, LLC

Unity House had invested $153,500 in this speculative real estate development project in the southern California desert. The project is overseen

by Zimmler Development, which, like Granite Investment Advisors, is associated with convicted felon Dean Kirkland. On March 7, 2005, after determining that retention of this investment posed unacceptable risks, the Receiver recovered $149,892 of Unity House's original investment.

4.    Radisson Kauai Development

In late 2004, Unity House invested $2,500,000 in this development project, the goal of which is to convert a Radisson hotel on Kauai into condominiums. The Receiver has been told by Brian Anderson, a principal in the development corporation, that the condominiums will be marketed before the end of 2005, and the Receiver is monitoring the investment closely.

5.    Hoana Medical

Prior to the Restraining Order, Unity House had invested $1,000,000 in this start-up venture to develop medical monitoring equipment. Anthony Rutledge, Sr. also made a substantial personal investment in this company, underscoring the likelihood of a potential conflict of interest. Although Hoana Medical appears to be a legitimate company, and the eventual return could be substantial, this is an extremely high-risk investment. The progress of this venture is being monitored; an investigation into recovering or liquidating some of Unity House's investment is being considered.

6.   Real Estate

Upon institution of the receivership, it was discovered that Unity House was attempting to sell two pieces of real property, the "NCR Building" (720 Kapiolani Boulevard, Honolulu) and the Marks Estate (3860 Old Pali Road,

Honolulu).  In researching Unity House files, the Receiver found no appraisals or other due diligence to determine market value of these properties.  After determining values through third-party appraisals and with Court approval, the Receiver sold the NCR Building for $6,025,000.  The sale price represents a $600,000 profit for Unity House on its investment.  Some of the proceeds from this sale were used to reduce Unity House's $8 million margin debt by 50%, to (at that time) $4 million.

Three real estate assets on Oahu – including the Marks Estate – have been evaluated and found to under-perform or otherwise cost Unity House to retain. The other two properties are a residence in Ewa and a condominium on Ala Moana Boulevard in Honolulu.  The Receiver obtained the Court's permission on April 26, 2005, to sell these assets.  Sale preparations have begun, but the Receiver is not yet formally marketing the properties.  As to the Marks Estate, Unity House has recently been sued by Douglas Himmelfarb, who claims to have a right to purchase the property, based on an alleged agreement with Unity House that pre-dates the receivership.  The marketing of the other two properties has been delayed because of outstanding concerns regarding the pending plea agreements' potential impact on the Receiver's post-receivership liability. Marketing has also been delayed because the United States Court of Appeals for the Ninth Circuit currently has pending before it the question of whether relevant criminal forfeiture statutes support the imposition of the receivership and pre-trial restraint of assets in this case.  Although the ultimate impact of the Ninth Circuit's decision cannot be clearly predicted, a ruling invalidating the receivership would

19



probably have negative ramifications on the Receiver's efforts to market and sell these properties.

    D.    <u>Conclusions re Management of Assets</u>

Consistent with a Bank of Hawaii analysis in 2003 that is part of the record, the Receiver's consultants and contracted auditors have discovered a significant pattern of high-risk investments by former Unity House management. Most of those investments ultimately resulted in a loss or little or no financial gain. Such investments were a major factor in the dramatic dissipation of Unity House assets. The Receiver has had to take significant action to address these investments in order to preserve the financial health of the organization.

If Unity House is to survive its current financial crisis, a coherent, reasonably conservative policy on investments must be implemented. The Board should thoroughly and independently review proposed investments, and should secure outside advice where appropriate. Following prudent investment guidelines, the organization should commit a relatively small percentage (5-10%) of its investment assets to high-risk ventures; it should invest the significant percentage of its investment funds in predictably performing vehicles that will support strict annual budgets.

## IV. PROGRAMS

The Receiver's goal, consistent with the orders of the Court, has been to continue as many of the programs and membership services for Unity House beneficiaries as possible within the constraints of its primary mission to preserve Unity House's assets pending disposition by the court. The programs include the

20

college scholarship (grants in aid) program, the early education scholarship program and senior services programs. Membership Services include notary services, travel planning assistance, references to workers compensation resources and several annual social events.

To this end, the Receiver constructed a 2005 budget to set guidelines, based on revenue forecasts, for expenditures on programs for beneficiaries. In deciding how the limited resources for 2005 should be spent, the more charitable and educational programs were emphasized, because these programs provide more vital services to beneficiaries than did some of the athletic and social events.

In mid-February, 2005, the Unity House website was restructured and redeveloped to better communicate to the beneficiaries the status and availability of programs. *See* www.unityhousehawaii.org. Changes included creating a new look, adding more information, and making the website more user-friendly. Programs and events information has been continuously updated. The new website contains information and web links to assist Unity House beneficiaries to secure additional financial aid for a variety of purposes (*e.g.*, College Connections, Gear Up, Federal Grants, Teamsters Scholarship, PACT, etc.). Discount programs with local businesses at no cost to Unity House were developed, and information on these programs is provided on the website as well as in newsletters. These programs are discussed in greater detail below.

Since the inception of the receivership in December, 2004, four newsletters have been produced, printed and mailed to 8,200 Unity House

former members' households.  Two of these newsletters were a joint effort with Teamsters Local 996, and thus were mailed to an additional 6,300 recipients. The Receiver is currently overseeing work on a newsletter to be distributed in late November or early December, 2005.  All newsletters are available to print or download from the Unity House website.

A report on the various programs from the Unity House Director of Programs and Services is attached as Exhibit F.  Below is a summary of the status of various programs.

A.    Educational Programs

1.    College Scholarship Program (grants in aid)

The Receiver has continued the College Scholarship Program while adding a few changes to procedures and methods of information-gathering from beneficiaries.  The program had required beneficiaries to volunteer for a certain number of hours of community service at Unity House in exchange for benefits; this requirement was modified so that beneficiaries could volunteer at any charitable non-profit organization.  To gather data that will be required in future grant applications for program funding from outside sources, family income amounts and other information requests were added to applications for the College Scholarship Program.

Additional changes to the program include extending the time period in which students or a family member may complete the community service requirement and reducing the required volunteer hours for older students to equalize the requirements for all school years.  Further, the application fee was

22

reduced from $50 for a first time applicant and $35 for renewals to $35 for first time applicants and $25 for renewals for 2006.

In January, 2005, 211 college scholarship award requests that had been granted for the Fall semester of 2004 were reviewed. Based on compliance with the program requirements, 188 awards were continued for the spring semester of 2005 in the total amount of $78,912.50.

Between February 1 and April 15, 2005, College Scholarship applications were made available to beneficiaries via the Unity House website, request by mail, on property postings and walk-ins. Over 200 applications were distributed. By the April 15, 2005, deadline, Unity House received approximately 160 applications.

As of August 15, 2005, 142 college scholarship awards had been granted for the 2005-2006 school year. The fall semester awards total $72,000, and checks have been mailed to the various schools. Spring, 2006, awards will be distributed after review of student compliance with the terms of the program in December 2005. Currently, $144,000 is the expected total for scholarship awards for the 2005-2006 school year.

2.    Early Education Scholarship Program

The Early Education Scholarship Program assists Hawaii's working parents with the spiralling costs of early (i.e., prior to grade school) education for their children, which often exceed $500 per month. The increased costs of these services make them difficult to afford even for households with two working parents. Unity House's Early Education Scholarship Program provides grants to

23

parents to help them meet these expenses. (A related program, Unity House's annual School Supply Give-Away, is discussed under the Events and Miscellaneous Programs and Services section below.)

Like the College Scholarship Program, the Early Education Scholarship Program was retained, with a few changes to procedures and information-gathering. Family income and other information requests were added to applications for the Early Education Scholarship Program to gather data that will be required in grant applications for program funding from outside sources. This information was used in May, 2005, for a grant application to the Office of Hawaiian Affairs ("OHA"), after it was determined that nearly 50% of program participants are of Hawaiian descent. That grant request is currently under review by OHA and, if awarded, will be applied to increase the size of awards, as well as the total number of program participants.

Due to the transition to the receivership, the January 1, 2005-February 15, 2005, open enrollment period experienced reduced activity. In February, 2005, 74 award letters were mailed to parents and award checks were mailed to schools covering April–June, 2005. These awards amounted to $49.00 per child per month.

For the July 1, 2005-August 15, 2005, open enrollment period, the Receiver initiated certain changes to the program. First, the award was increased to $60 per child per month from $49 per child per month. Second, the program name was changed from the Child Care Program to "Early Education Scholarship Program." This name change may assist in securing future grants

24

from outside sources to support the program. Finally, November 15, 2005, was set as the deadline for fulfilling the 10-hour volunteer community service requirement for applicants; compliance is required by that date to ensure eligibility of the applicants for the following four months.

By the August 15, 2005, deadline, 111 applications were received, of which 78 were new applicants. Unity House began issuing awards on September 15, 2005. Estimated total awards will amount to approximately $37,000 for this period.

B.    Senior Programs

Unity House has a cooperative agreement with the City and County of Honolulu to manage and conduct daily classes at the Honolulu Pauahi Senior Center. Such classes include: tai chi, line dancing, ballroom dancing, hula, aerobics, and others. Any senior – whether or not a Unity House beneficiary – is eligible to participate in these programs. Unity House also offers certain additional senior services for beneficiaries only. All of these programs support the mental and physical health of Hawaii's seniors.

Since the receivership's inception, Unity House has sponsored or participated in the following activities:

–    In April, 2005, 80 retirees were escorted for a Whale Watch excursion, which featured a significant discount for each participant.

–    In May, 2005, Unity House supervised the registration of nearly 150 senior citizens for summer classes. Unity House also made certain cosmetic renovations to the Pauahi Senior Center, which have been

well-received.

    _   In May, 2005, Unity House developed a senior citizen discounts flier and distributed it to seniors.

    _   In July, 2005, Unity House co-sponsored the Teamsters Local 996 Pre-Retirement Seminar.  About 100 Unity House beneficiaries attended, and the event was considered a success.  Another such seminar is tentatively planned for November or December, 2005.

    _   In August, 2005, 50 retirees were escorted on the Kualoa/Alii Tours excursion.  Each beneficiary received a significant discount on the price of admission.

In addition, the annual Unity House Retiree Thanksgiving Luncheon is scheduled for Sunday, November 20, 2005.  It is estimated that 1,500-1,600 seniors will attend.

    C.    <u>Events and Miscellaneous Programs and Services</u>

The Receiver has been compelled to eliminate certain social and athletic events due to budget constraints, as detailed in the report from Programs and Services at Exhibit F.  It is likely that additional reductions will be required in 2006, in order to balance the budget.  Nevertheless, the Receiver oversaw a number of social and athletic events in 2005, as described below.

Unity House's annual Keiki Zoolites event at the Honolulu Zoo was scheduled for December 16, 2004 – just two days after the Receiver took custody of Unity House.  The Receiver decided that going forward with the event was in the best interest of the Unity House beneficiaries and would allay some of

their concerns regarding the continuation of Unity House programs under the receivership. Despite certain logistical problems related to staffing and the freezing of bank accounts under the Restraining Order, the event occurred as scheduled. The evening went smoothly with some 2,500 participants, many of them children, enjoying arts and crafts, games, live entertainment, dinner, and refreshments. The success of the event was largely due to the dedication of many Unity House employees. A similar event is scheduled for December, 2005.

The Arthur Rutledge Memorial Golf Tournament took place as scheduled in February, 2005, with 180 participants. Unity House is currently researching the possibility of turning this project into an educational fundraising event in 2006.

Unity House sponsored two "Cosmic Bowling" tournaments, one in May and the other in July, 2005. Each event attracted approximately 130 participants.

Two hundred sixteen Unity House beneficiaries (along with approximately 30 others) attended the Unity House-sponsored annual Las Vegas Golf & Bowling Tournament from October 10 through October 14, 2005. Two Unity House staff members travelled with and assisted the group in Las Vegas, Nevada. However, the cost and time required to schedule, plan and execute this event makes it a likely candidate for cancellation in 2006.

For its annual School Supply Give-Away, Unity House prepared 2,500 school packets for free distribution at the Ala Moana Back to School Event in August, 2005. The give-away was advertised in Unity House's September, 2005, newsletter, on the Unity House website, and by press release. Approximately 1,900 school supply packets were distributed in two days. The remaining

27

packets have been made available for pick-up by Unity House beneficiaries at the Unity House office; any unclaimed packets will be donated to needy grade schools.    Unity House's public relations/media consultant, Skyward Communications, has coordinated a delivery of over 300 packets of school supplies to Likelike Elementary third graders in Kalihi, as well as Puuhale Elementary and Princess Kaiulani Elementary.  In addition, donations were made to Nanakuli Elementary/Ke Kula Kaiapuni O Nanakuli (Hawaiian immersion elementary school).  Unity House will make additional donations to other needy schools, if supplies are available.

> D.    Conclusions re Programs

Under the Receiver, most of the programs of Unity House have been continued.  Although Unity House eliminated certain social or athletic events, the Receiver maintained – and in some cases expanded – the most critical Unity House programs.   In light of limited resources, certain program cuts were inevitable to maintain the long-term viability and financial health of the organization.  Additional details are described in the attached report regarding Programs and Services, Exhibit F.

## V.  LITIGATION

The Receiver has had to devote substantial Unity House resources to litigation costs and attorneys fees.  Most of this litigation arose from pre-receivership business and investment activities.  In addition, Unity House has been named as a defendant in two lawsuits filed since the inception of the receivership.  One of these suits (the <u>Himmelfarb</u> case) arises from an alleged pre-receivership real estate sales agreement, pertaining to the Marks Estate.  The other (the <u>Aarona</u> case) arises out of the same transactions that are part of the basis for the criminal indictment and is directed against former Unity House management and directors.  Below is a brief description of all significant litigation.

A.    National Union Fire Insurance settlement in <u>Donna Sato</u> v. <u>Michael Tanaka, Unity House, Inc., et al.</u>, Civil No. 99-2094-05 (First Circuit Court, State of Hawaii)

This pre-receivership litigation centered on whether a certain civil suit involving sexual harassment accusations should have been covered by Unity House's insurance policy.  When Unity House was seized, a settlement offer from the insurer for $115,000 was pending acceptance.  Previous counsel for Unity House had not responded to this offer for a protracted period, hoping that the offer would eventually be increased.  To avoid further cost and delay, the Receiver instructed present counsel for Unity House to complete the settlement.  Unity House has received the proceeds, $115,000.

B.    <u>Stanford Carr Development Corp., et al. v. Unity House, Inc., et al.</u>, Civil No. 99-1781-05 (VLC) (First Circuit Court, State of Hawaii).

<u>Hale Lokahi, Ltd., et al. v. SCD Ewa Corp., et al.</u>, Civil No. 99-1859-05 (VLC) (First Circuit Court, State of Hawaii).

29

This pre-receivership litigation between Unity House and a developer arose from the failed development of Lokahi Trovare. Pending since 2000, it has been a great expense to Unity House. The central issue in the case is the nature of the business relationship between Unity House and the Stanford Carr-related entities.

Unity House lost this case in the Hawaii First Circuit Court prior to the receivership, and Stanford Carr currently has a $900,000 judgment against Unity House for attorneys' fees and costs. Unity House is appealing and has recently filed its opening and reply briefs in the Supreme Court of Hawaii (S. Ct. No. 26906).

C.  <u>Association of Apartment Owners of Hanohano Hale and Association of Apartment Owners of Pat's at Punaluu v. Unity House, Inc., et al.</u>, Civil No. 99-1122-03 [B.I.A.] (First Circuit Court, State of Hawaii).

This pre-receivership litigation arises from a 1997 loan from Unity House to the Hanohano family for which certain real properties were pledged as collateral. After the Hanohanos defaulted and protracted litigation ensued, in February, 2005, the court ruled that Unity House was entitled to have collateral redeemed for $10.258 million; a judgment of foreclosure is pending. Unity House has since moved for the institution of formal foreclosure proceedings, which the court recently approved. The matter is currently in pre-appeal settlement negotiations; discussions among counsel are continuing, while Unity House is

pursuing foreclosure.[6]

D.    Unity House, Inc., v. Heavenly Road Productions, Inc., et al., Civil No. 98-0-005043 (First Circuit Court, State of Hawaii).

This pre-receivership litigation arises from a failed movie production deal in the late 1990s. Several years ago a settlement agreement was reached whereby defendants would pay $537,303.00 due to Unity House. Defendants never performed on this agreement. Since the receivership was instituted, Unity House has successfully pursued court-ordered enforcement of the settlement agreement. Defendants sought reconsideration of this ruling; their motion was denied on September 20, 2005.

E.    Kaleo Aarona, et al. v. Unity House, Inc., et al., No. CV05-00197 (DAE) (BMK) (United States District Court for the District of Hawaii).

After the institution of the receivership, this suit was filed by several previously suspended board members or officers of Unity House against Unity House and certain individual defendants, including Anthony Rutledge, Sr., Aaron Rutledge, and several members of the Unity House Board of Directors who were serving as of the initiation of the receivership. Its allegations largely mirror those in the criminal indictment. The plaintiffs seek, among other things, the reinstitution of Unity House membership and a Board of Directors elected by the membership.

The case has been stayed pending developments in the present criminal case. In late August, 2005, plaintiffs moved for the appointment of a receiver for

---

[6] Real property related to this litigation known as "Punaluu" was erroneously listed as an asset subject to the restraining order that appointed the Receiver. The state trial court in this litigation

Unity House.    That motion remains pending while the stay of proceedings continues.

F.    <u>Hawaii Pacific Cinema Development Foundation, et al. v. Beacon Edge Pictures, LLC, et al.</u>, Civil No. CV 04-00510 (ACK) (KSC) (United States District Court for the District of Hawaii).

This pre-receivership litigation arises out of a $1 million film investment undertaken by Unity House, Inc.    When the venture did not go forward, the producer, Beacon Edge President Gayle Dickie, was obligated to return the entire investment to Unity House; however, $250,000 of the $1 million was not returned.    Rather, Ms. Dickie transferred the money into her own personal account and the accounts of yet to be identified recipients.

Documents subpoenaed by counsel for Unity House in receivership indicate that, on November 26, 2003, Ms. Dickie wired $150,000 from Beacon Edge into her personal account with Washington Mutual Bank.    The Receiver has also obtained Dickie's Washington Mutual account documents, which indicate that she either spent these funds or transferred them to other accounts over an 11-month period.    Dickie also transferred funds to foreign bank accounts; on November 2, 2003, she wired $8,000 to an unidentified recipient in the Kingdom of Bahrain, and on December 10, 2003, she transferred $8,960 from her Washington Mutual account to an unidentified foreign recipient.    The Receiver has obtained additional bank documents that may lead to other recipients.

Unity House was unsuccessful in its attempts to serve Ms. Dickie personally.    After obtaining court approval, Unity House completed service by

---

held that Unity House is not, as a matter of law, the owner of this property.

publication.   Unity House has obtained a default judgment against all of the defendants in the United States District Court for the District of Hawaii.

G.    National Union Insurance Matter

Unity House's primary insurance carrier pre-emptively denied Unity House coverage for liability arising out of the Aarona litigation.   Counsel for Unity House in receivership believe that this determination was erroneous.   This dispute could likely have been avoided had Unity House ensured that its policy was properly renewed and in full force as of its November, 2004, renewal date.   But complications regarding Unity House's renewal of the policy have led National Union to assert that it has no duty to defend or indemnify Unity House or its management and directors.

No complaint for relief has been filed.   Unity House is currently awaiting a response from the insurer regarding requests for certain information.   Former management and several suspended directors have demanded that Unity House indemnify and defend them for claims arising from the criminal case, as well as the Aarona litigation.   The Receiver has passed these requests on to the insurer. Both the insurer and the Receiver have declined to indemnify or defend previous management and suspended members of the Board of Directors.

H.    Douglas Himmelfarb v. Unity House, Inc., et al., Civil No. 05-1-
       1386-07 (VSM) (First Circuit Court, State of Hawaii).

This case arises out of an alleged agreement between Douglas Himmelfarb and Unity House, Inc., for the purchase of the Marks Estate, a residence on 4.7 acres in Nuuanu, Oahu.   The DROA at issue has a "reference date" of June 7, 2004.   The purchase price was $4,000,000. Mr. Himmelfarb paid

33

a $60,000 initial deposit.  The Scheduled Closing Date was September 21, 2004; this was purportedly extended to November 5, 2004.  The parties used a form DROA, filling in blanks and checking boxes on the margins.  The checked boxes include C-22 [No Contingency for Obtaining Cash Funds] and C-8 [Time is of the essence and the Scheduled Closing Date may not be extended unless both Buyer and Seller so agree in writing].

The purchase price was never tendered by Mr. Himmelfarb.

C-32 of the DROA (Mediation) provides that if any "dispute or claim" arises out of the DROA and the parties are unable to resolve it, "Buyer and Seller agree in good faith to attempt to settle such dispute or claim by non-binding mediation." Neither Mr. Himmelfarb nor his counsel ever discussed mediation prior to filing suit, and Mr. Himmelfarb has refused Unity House's request to dismiss the lawsuit without prejudice and enter into mediation.

Mr. Himmelfarb filed suit in the Circuit Court of the First Circuit on July 29, 2005.  The complaint has four counts: 1) Breach of DROA, Damages, and Specific Performance; 2) Breach of Contractual Duties (failure to maintain property pending sale); 3) Reliance; and 4) Fraud and Misrepresentation. The relief sought is specific performance, compensatory and punitive damages, attorneys' fees and costs. There is no demand for a jury.

Mr. Himmelfarb claims  reliance damages as follows: $60,000 deposit, $25,000 check [apparently uncashed], $10,000 travel expenses, $8000 architectural expenses, $175,000 in furnishings and lighting for the subject property and over $8500 in storage fees.

Unity House filed a Motion to Dismiss in the state court action.    Mr. Himmelfarb also filed a motion in the criminal case, entitled Motion for Intervention to Confirm Sale of Property, or in the Alternative, to Compel the Federal Receiver of Unity House to Proceed with Litigation in State Court, which motion was denied by Chief Judge Ezra on October 6, 2005.  Unity House, Inc., in addition to opposing said motion, filed a Countermotion for an Injunction Against Prosecution of Civil Action No. 05-1-1386-07 VSM in the Circuit Court and/or a Finding of Civil Contempt and an Award of Attorney's Fees and Costs.

On October 14, 2005, the Honorable Victoria S. Marks heard Unity House's motion to dismiss.  She stayed the litigation and ordered the parties to mediate.  A status conference is set for January 9, 2006.

I.      Unity House, Inc., v. Chabad Lubavitch of Hawaii, Inc., et al., Civil No. 05-1-1399-08 RKOL (First Circuit Court, State of Hawaii).

Pursuant to agreements dating back to 1998, Unity House lent Chabad Lubavitch of Hawaii, Inc., $222,500 to fund a real estate development project. Attempts by Unity House to collect this loan prior to the receivership had been abandoned, and by the time the Receiver was appointed, the collateral for the loan had become almost worthless.  After several months of discussions with the debtor, the Receiver filed a civil action to pursue collection of this debt.  That action is currently pending in the Hawaii First Circuit Court.  On October 17, 2005, the defendant filed an answer to the complaint.

## VI.  COLLECTION OF RECEIVABLES

The Receiver's efforts to collect receivables have generally been productive.  For example, the Receiver has compelled debtors to commence payments on three loans (obtaining complete payment on one of the three) collectively valued in excess of $125,000.  These results were obtained without resort to litigation.  The ease with which the Receiver secured payment, the terms of the loans themselves, and the identity of their recipients raise questions why these loans were made by prior Unity House management and why efforts to collect had not been pursued.  Other receivables, however, have proved more challenging to recover, and, in one case (Chabad Lubavitch, *supra*), Unity House has filed a collection action in an effort to minimize its losses.

Below is a summary of actions taken related to various receivables.

A.    Astra Insurance/Grant Kidani

This $50,000 loan, made by Unity House in June 2003 to attorney Grant Kidani, was apparently intended to provide partial funding for the creation of an insurance company.  As of the time the receivership was imposed in December, 2004, no action had been taken by Unity House to collect on this debt.  After several months of negotiation, on July 2, 2005, the Receiver was able to obtain return of the entire principal.  On August 31, 2005, after further negotiations, the Receiver obtained payment for the outstanding interest, calculated at 20% per annum, totalling $16,750, for a total recovery of $66,750.

B.    Romeo Mindo

As already reported to the Court in documents filed in the criminal case,

Unity House made a $40,000 personal loan in 2004 to Romeo Mindo. Its purpose is unknown, but the recipient, a former Unity House employee and Hawaii State Senator, was running for re-election at the time. There are serious questions as to the propriety of this loan, particularly if Mr. Mindo was a Unity House member at the time. The debtor began making payments immediately after the institution of the receivership and fully satisfied the debt, plus interest, as of March 31, 2005.

      C.    Hawaii Hospital and Health Care Workers Union/James Kellogg

Unity House made two loans to James Kellogg of the Hawaii Hospital and Health Care Workers Union in March and June, 2004, totalling $35,000. The loans were intended as start-up funds for a new union, and the loan documents were ambiguous as to the date upon which the loans were due for repayment. After discussions with Mr. Kellogg, a new loan document was negotiated in May, 2005, and the debtor has made periodic payments through October, 2005.

      D.    Samuel Kornhauser, Esq.

Prior to the receivership, Unity House paid $52,657.47 to attorney Samuel Kornhauser, apparently as an advance for a lawsuit on behalf of Hotel Employees and Restaurant Employees, Local 5. The lawsuit was not related to Unity House. Mr. Kornhauser has represented to the Receiver that the case was settled long ago and that his fees amounted to approximately $47,000. His recollection is that the balance of the settlement was deposited into the Local 5 pension fund. He promised to provide a full copy of the file by July 15, 2005, which he has not yet delivered. It is uncertain whether these funds could be

recovered short of litigation with Local 5. The Receiver recommends no further action at this time, pending further investigation.

     E.    <u>Investment In Oceanside, California</u>

In August 2004, Unity House provided $28,514 to Zimmler Development to pursue a potential real estate development in Oceanside, California. Unity House had dealt with Zimmler Development previously (discussed above); the company was associated with convicted felon Dean Kirkland. The real estate development for which these funds were provided was unsuccessful. Although Unity House's investment may have to be written off as a loss, the Receiver is currently investigating whether any recovery is possible.

## VII. TAX-EXEMPT STATUS

Since its founding in 1951, Unity House has reported to the Internal Revenue Service as a tax-exempt labor organization pursuant to Section 501(c)(5) of the Internal Revenue Code. In order to maintain this designation, tax-exempt labor organizations must comply with various operational and organizational requirements. Soon after taking custody of Unity House, the Receiver became concerned that Unity House's structure and activities (including allegations in the indictments in this case) may have threatened Unity House's 501(c)(5) status. The Receiver retained the tax consulting firm of Bowen Hunsaker Hirai to investigate this issue. The results of their analysis indicate a number of potential compliance issues relating to Unity House's structure and activities that may need to be remedied in order to maintain Unity House's tax-exempt status going forward. Below is an outline of some of the issues revealed

by the analysis.

A.    Membership

Internal Revenue Service guidelines indicate that labor organizations, as that term is used in Section 501(c)(5) of the Internal Revenue Code, must be membership organizations.    *See, e.g.,* Internal Revenue Manual ("IRM") §§ 4.76.14.3.1(1) ("A labor organization is a membership organization made up primarily of employees or representatives of employees."), 7.25.5.2.1(1) (same), 4.76.14.3(1) (defining "labor organization" as "an association of workers").    In fact, examination of membership criteria is one of the tests employed by the IRS when determining whether an entity qualifies as a labor organization. *See* IRM §§ 4.76.14.3.1.1(2), 7.25.5.2.1(4) ("where most of an organization's members are entrepreneurs or independent contractors it will not qualify for exemption as a labor organization under IRS 501(c)(5).").

As noted in the Introduction, prior Unity House management eliminated the organization's membership in 2004.    It is unclear whether the prior management counsel or Directors considered whether or how this would affect the organization's tax status.    In light of the IRS authorities cited above, it appears the elimination of membership may indeed have threatened Unity House's ability to claim tax-exempt status under Section 501(c)(5).

B.    Control

In order to qualify for tax-exempt status under Section 501(c)(5), Unity House must also be controlled by individuals who are connected with a labor organization.    "Persons with no connection with a labor organization should not

39

control the organization." IRM § 7.25.5.2.2. It is unclear whether Unity House's prior management structure met this obligation. Unity House's Articles of Incorporation provide that two of the organization's directors be from specified local unions. While this ensures *some* degree of influence by individuals necessarily related to labor organizations, the provision certainly does not guarantee a majority presence on the board of directors – or control in some other fashion – by individuals connected with unions.

Apart from the structure of the organization as set forth in the organizing documents, it is unclear whether Unity House has, in practice, been controlled by individuals connected with labor organizations. For example, although Anthony Rutledge, Sr. once played a significant role within the management of the union now known as UNITE HERE Local 5, he has for years been barred from participating in Local 5's activities or having any direct contact with union members of Local 5. Although the Receiver believes that Anthony Rutledge, Sr. and perhaps other directors may have informal associations with certain other unions, his and some other prior board members' formal connections with any unions are in doubt. The same may be true of Unity House officers.

C.    Questionable Activities

In addition to the structural issues addressed above, numerous activities undertaken by previous Unity House management may have imperilled Unity House's tax-exempt status. In order to qualify as a tax-exempt labor organization, none of Unity House's net earnings may inure to the benefit of any member. *See* Treasury Regulation § 1.501(c)(5)-1(a)(1); IRM § 4.76.14.3.2.

40

Unity House has engaged in a number of questionable transactions that may violate this prohibition.

For example, Unity House has made numerous personal loans to individuals who were also Unity House members. Loans to members have been specifically identified by the IRS as a potential source of inurement in violation of the tax code. IRM § 4.76.14.3.2(3)(b).

Unity House also solely funded the project known as Hawaii Pacific Cinema. Anthony Rutledge, Sr. was the president of that organization. To the extent that this arrangement may have constituted personal use of Unity House property by a Unity House member or otherwise represented the inuring of Unity House earnings to the benefit of a member, it was likely to have been an improper arrangement. IRM § 4.76.14.3.2(3)(c). Similarly, Unity House has a substantial stake in a company known as Hoana Medical, in which Anthony Rutledge, Sr. has a personal interest. Again, Unity House's involvement in this company could constitute prohibited inurement of Unity House earnings to the benefit of a member, as well as a conflict of interest.

Additionally, Unity House apparently gave up a major real estate investment opportunity to a paid consultant and Unity House member.[7] Indeed, Unity House not only forewent this opportunity, but it pledged significant funds to guarantee a loan to finance the transaction on behalf of a corporation controlled by the member. The property is currently owned in the name of that corporation.

---

[7] Names have been omitted because of the possibility of future litigation pertaining to this transaction.

This transaction may have constituted the inurement of Unity House earnings to the benefit of a member.

Further, Unity House maintained a condominium that has been utilized as a dwelling for extended periods by Anthony Rutledge, Sr., his social guests and family, and his personal Los Angeles attorney, Jeffrey Rawitz of the Jones Day law firm. The use of the condominium does not appear to have been part of any Board-approved compensation package for Mr. Rutledge's services to Unity House. Instead, such activity appears to violate the IRS rules against personal use of a tax-exempt organization's property by a member. *See* IRM § 4.76.14.3.2(3)(c).

In addition to these concerns, the consultant's analysis indicates the possibility that some of Unity House's regular programs may be more properly carried out by a tax-exempt charitable entity organized under Section 501(c)(3), rather than Section 501(c)(5).

D.    Conclusions re Tax-Exempt Status

The conduct of the prior Board of Directors and management of Unity House may have threatened or compromised the organization's tax-exempt status. The Receiver has taken various steps to identify and remedy these problems. Among other things, the Receiver has invited the Internal Revenue Service TE/GE (Tax Exempt and Government Entities department) to conduct a review of Unity House's structure and activities. The Receiver anticipates working cooperatively with IRS to remedy any compliance issues necessary to rehabilitate the organization. Taking a highly proactive approach to this issue is

42

in the best interests of the organization and its beneficiaries. Although the IRS initially indicated that it would likely not review Unity House's tax status until the completion of the criminal matter in which the Receiver was appointed, the Receiver was informed by IRS on October 17, 2005, that a case agent will begin looking into Unity House's tax exempt status in the near future. In the meantime, the Receiver is exploring ways in which Unity House may best comply with its obligations as a tax-exempt entity, while continuing to provide important services to its beneficiaries.

## VIII. CONCLUSION

Since becoming responsible for Unity House's operations in December of 2004, the Receiver has taken a series of steps to safeguard Unity House assets and rehabilitate its financial operations. At the time of the Receiver's appointment, Unity House was suffering from several years of substantial net losses and was approaching insolvency. The Receiver has acted to eliminate most of the major problems and stabilize Unity House's ongoing operations. These include such cost saving measures as eliminating unnecessary positions, reducing the number of "consultants" and discontinuing wasteful expenses. The Receiver has also made major reforms in managing Unity House assets, such as reducing an intolerable margin of debt, liquidating highly speculative stock investments and selling under-performing real estate investments. The Receiver has resolved a number of pending civil lawsuits by prosecuting, defending or settling them. The Receiver has moved forward on collecting outstanding receivables, some of which had languished or been ignored.

43

In implementing these reforms, the Receiver has maintained most of the programs and services Unity House has provided to its beneficiaries. Although some social and athletic events were cancelled, the most critical services have been maintained, and in some cases expanded.

In evaluating Unity House's future operations, the Receiver notes three items of particular concern. First, the apparent failure of the Board of Directors to effectively perform their fiduciary duties, exercise proper oversight, and implement budget controls in the face of clear financial crises were major factors in Unity House's financial decline. Second, the possibility that Unity House may pay a substantial portion of its funds to defendant Anthony Rutledge, Sr., to indemnify him for his fees in defending the criminal charges threatens to impose a severe burden on Unity House's remaining assets. Third, many decisions and transactions consummated by the prior management and Board of Unity House may have jeopardized Unity House's status as a tax-exempt entity.

Finally, the Receiver notes that it has deferred certain actions due to the uncertainty caused by the pendency of the plea agreements. If the receivership continues after the Court has ruled on the plea agreements, the Receiver will seek further guidance from the Court regarding, specifically, the sale of real

/ / /

/ / /

/ / /

44

properties and potential lawsuits aimed at repatriating assets.    If the Court accepts the plea agreements or dissolves the receivership for other reasons, the Receiver asks that the Court retain jurisdiction to address any matter concerning the administration of the receivership.

Date: October 20, 2005                              Respectfully submitted,

ANTHONY POUNDERS, AGENT
EG&G Technical Services, Inc.,
Court-Appointed Receiver Of
Unity House, Inc.

45